Office of the United States Trustee
1100 Commerce Street, Room 976
Dallas, Texas 75242
(214) 767-8967
Meredyth A. Kippes
for the United States Trustee
meredyth.kippes@usdoj.gov

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No.    24-80093-mvl11 |
| | § | |
| **CAREMAX INC., et al.,** | § | (Jointly Administered) |
| | § | |
| *Debtor*. | § | Chapter 11 |
| | § | |

## UNITED STATES TRUSTEE'S OBJECTION TO CONDITIONAL APPROVAL OF DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN OF CAREMAX, INC. AND ITS DEBTOR AFFILIATES
(related to docket entry no. 19)

TO THE HONORABLE MICHELLE V. LARSON,
UNITED STATES BANKRUPTCY JUDGE:

Lisa L. Lambert, the United States Trustee for Region 6 (the "United States Trustee"), files this objection (the "Objection") to conditional approval of the Disclosure Statement for Joint Chapter 11 Plan of CareMax, Inc. and its Debtor Affiliates (the "Disclosure Statement," Docket Entry No. 19).

### SUMMARY

The United States Trustee objects to conditional approval of the Disclosure Statement because the Debtors' proposed Joint Chapter 11 Plan of CareMax, Inc. and its Debtor Affiliates (the "Plan," Docket Entry No. 18) contains impermissible third-party releases, exculpations, and injunctions that render the Plan patently unconfirmable. Because the Court approves the ballot when approving the disclosure statement, and because here, the ballot will facilitate certain of the

Plan's flaws, parties in interest should have an opportunity to object to the ballot and Disclosure

Statement in advance of a confirmation hearing on a Plan with such impermissible provisions.

Specifically, the United States Trustee objects to the following:

a. The Plan violates the United States Bankruptcy Code by imposing nonconsensual third-party releases on:

   i. claim holders in voting classes do not return ballots with an "opt-out" election checked; and

   ii. non-voting claim holders who do not return an "opt-out" form.

Through this process, the Plan imposes non-debtor releases without the releasing parties' affirmative, voluntary, and knowing consent under state law. The releases are thus nonconsensual and cannot be approved under recent Supreme Court precedent.

b. The Plan violates the Bankruptcy Code by imposing a sweeping injunction to enforce both the exculpation provision and the nonconsensual plan releases.

c. To the extent that applicable law authorizes exculpation beyond 11 U.S.C. § 1125(e), the Plan's broad exculpation provision contravenes Fifth Circuit authority.

d. The Plan should specify that the Plan does not release claims of governmental entities exercising their police and regulatory authority.

## FACTUAL ALLEGATIONS

### The Disclosure Statement, Plan, and Solicitation

1. On November 17, 2024, the Debtors filed the Plan, Disclosure Statement and a solicitation motion (the "Solicitation Motion," Docket Entry No. 20) seeking conditional approval of the Disclosure Statement.

2.      A hearing on the Solicitation Motion and conditional approval of the Disclosure

Statement is set before this Court on December 17, 2024.

**Certain Disclosure Statement and Plan Terms**

***Classification of Claims and Interests***

3.      Article III of the Plan sets forth the following classes of claims.

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | First Lien Debt Claims | Impaired | Entitled to Vote |
| Class 3 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 4 | Intercompany Claims | Impaired / Unimpaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) (Deemed to Reject) |
| Class 5 | Intercompany Interests | Impaired / Unimpaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| Class 6 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 7 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

4.      Class 3, General Unsecured Claims, will be paid from a GUC Cash Pool, which

will be reserved from the transactions proposed under the Plan for the benefit of unsecured

creditors.  *See* Disclosure Statement Article IV.  The GUC Cash Pool is defined under the Plan as

"Cash equal to $0; provided that it shall be $350,000 if the Confirmation Order is entered within

(75) days of the Petition Date; provided, further that the GUC Cash Pool shall be $250,000 if the

Confirmation Order is entered within 76-90 days of the Petition Date." *See* Plan, Article I. The proposed GUC Cash Pool consists of sale proceeds "reserved for the benefit of general unsecured creditors, which the Debtors negotiated for in connection with the [prepetition restructuring agreement] for the benefit of general unsecured creditors." *See* Disclosure Statement Article III, Section D, paragraph 19. The GUC Cash Pool "will be reduced and/or entirely eliminated depending on when the Plan is confirmed (in which case general unsecured creditors will receive the recovery to which they are entitled under the absolute priority rule)." *See* Disclosure Statement Article III, Section D, paragraph 19.[1]

5.      Here, beyond the named parties, the Plan defines the "Releasing Parties" as including: (i) all Holders of Claims or Interests that vote to accept the Plan; (ii) all Holders of Claims or Interests that are deemed to accept the Plan and who do not affirmatively opt out of the releases provided in the Plan; (iii) all Holders of Claims or Interests that abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan; (iv) all Holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan; (v) each Purchaser; (vi) the Committee and its members, each in their capacities as such; and (vii) each Related Party of each Entity in clause. The definition of "Releasing Party" in the Plan further provides that an "Entity shall not be a Releasing Party if it: (x) elects to opt out of the Third Party Release; or (y) timely objects to the Third Party Release, either through (i) a formal objection filed on the docket of the Chapter 11 Cases or (ii) an informal objection provided to the Debtors by electronic mail, and such objection

---

[1] The Debtors seek to grant to their prepetition lender/debtor-in-possession lender a "last look" lien on avoidance actions, which are often the only unsecured assets in an estate available to general unsecured creditors. *See* Debtor's Emergency Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Obtain Postpetition Financing, (II) Use Cash Collateral, (III) Grant Senior Secured Liens and Provide Claims with Superpriority Administrative Expense Status, and (IV) Grant Adequate Protection to the Prepetition Secured Parties, (B) Modifying the Automatic Stay, (C) Scheduling a Final Hearing, and (D) Granting Related Relief, Docket Entry No. 6.

**UNITED STATES TRUSTEE'S OBJECTION TO CONDITIONAL
APPROVAL OF DISCLOSURE STATEMENT**                                    **Page 4**

is not withdrawn on the docket of the Chapter 11 Cases or via electronic mail, as applicable, before

Confirmation." *See* Plan, Article I.  Based on the United States Trustee's reading of this provision,

despite the language to the effect that all Holders of Claims or Interests that vote to accept the Plan

are Releasing Parties, the later provision that an "Entity shall not be a Releasing Party if it: (x)

elects to opt out of the Third Party Release" would also apply to those creditors.  Nevertheless,

that provision must be clarified before the Plan can be solicited.

6.     Each proposed form of ballot for voting creditors provides a checkbox for the

individual creditor to vote for or against the Plan and a separate checkbox for the individual

creditor to opt-out of the Third-Party Release.[2]  *See* Solicitation Motion.  The Plan provides that

voting creditors are deemed to consent to the Third-Party Release unless they opt out of it on the

ballot, even if they choose not to vote at all.

7.     Non-voting creditors will be sent only a notice (the "Non-Voting Notice"), which

is contemplated to provide information on how to obtain the Debtors' full solicitation package but

does not include any of the documents themselves.  The Non-Voting Notice is contemplated to be

accompanied by an opt out release form with a checkbox for the individual creditor to use to opt

out of the Third-Party Release and then return it to the Debtors. *See* Solicitation Motion.  The Plan

provides that non-voting creditors are deemed to consent to the release if they do not return this

form with the opt out box checked, even though they are not entitled to vote on the Plan.

**Governing Law**

8.     Article XII section K of the Plan defines the governing law for the Plan as the laws

of the State of New York.

---

[2] For the purposes of this Objection, the term "Third-Party Release" means the release set forth in Article IX section B of the Plan.

## **OBJECTIONS**

### **The Court should decline to conditionally approve the Disclosure Statement because the Plan is patently unconfirmable.**

9.      If there is a defect that makes a plan patently or inherently unconfirmable, the Court may consider and resolve that issue at the disclosure statement stage before requiring parties to proceed with solicitation of the plan and a contested confirmation hearing.  *In re American Capital Equipment, LLC*, 688 F.3d 145, 153-54 (3d Cir. 2012).  *See also, In re United States Brass Corp.*, 194 B.R. 420, 422 (Bankr. E.D. Tex. 1996).

10.      The Court's equitable powers under 11 U.S.C. § 105 permit the Court to control its own docket and, therefore, to decline to approve a disclosure statement when the plan it supports may not be confirmable.  *In re American Capital Equipment, LLC*, 688 F.3d at 154.  A plan is patently unconfirmable when confirmation defects cannot be overcome by creditor voting and the confirmation defects relate to matters upon which the material facts are not in dispute or have been fully developed at the disclosure statement hearing.  *Id*. at 154-55.

11.      The Plan is patently unconfirmable because it contains impermissible release, exculpation, and injunction provisions.  Conditional approval of the Disclosure Statement in support of a plan with such impermissible terms would mean that a patently unconfirmable Plan would be solicited.  And here, the solicitation procedures for which the Debtors seek conditional approval will actually facilitate certain of the Plan's flaws, because they include the opt-out provisions that will not establish actual consent to the Third-Party Release. Rather, the Court should require the Plan and Disclosure Statement be amended to remove and/or tailor the release, exculpation, and injunctions so that they comply with applicable law.

**The Third Party Release**

### *Nonconsensual plan releases of non-debtor third parties by non-debtor third parties are not authorized under the United States Bankruptcy Code.*

12.     The Supreme Court has definitively held that non-consensual third-party releases are not authorized under the Bankruptcy Code.  *Harrington v. Purdue Pharma L.P.,* 603 U.S. __, 144 S. Ct. 2071, 2082-88 (2024) ("*Purdue*").  This has long been the conclusion held by the Fifth Circuit Court of Appeals.  *See Bank of N.Y. Trust Co. v. Off'l Unsecured Creditors' Comm. (In re Pacific Lumber Co.)*, 584 F.3d 229, 252 (5th Cir. 2009) (observing that prior Fifth Circuit authority "seem broadly to foreclose non-consensual non-debtor releases and permanent injunctions") ("*Pacific Lumber*").

### *State Contract Law Applies, Not Federal Law*

13.     The Supreme Court in *Purdue* did not address whether consensual non-debtor releases can be included in a chapter 11 plan and confirmation order.

14.     Whether parties have reached an agreement—including an agreement to release one's claims against another (*i.e.*, not to sue)—is governed by state law.  The only exception is if there is federal law that preempts applicable state contract law in some specific context.  *See, e.g., Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393, 416 (2010) (plurality) ("For where neither the Constitution, a treaty, nor a statute provides the rule of decision or authorizes a federal court to supply one, 'state law must govern because there can be no other law.'") (quoting *Hanna v. Plumer*, 380 U.S. 460, 471-72 (1965)).

15.     No such exception applies here.  There is no federal law generally governing when or whether certain non-debtor parties have agreed to release claims against other non-debtor parties.  No Bankruptcy Code provision addresses how to determine whether one non-debtor has agreed to extinguish its direct claims against another non-debtor.  And no Bankruptcy Code

provision authorizes courts, as part of an order confirming a chapter 11 plan or otherwise, to "deem" a non-debtor to have consented to an agreement to release claims against other non-debtors where such consent would not otherwise be found to exist as a matter of state law.  Nor does 11 U.S.C. § 105(a) itself confer any power to override state law.  Rather, section 105(a) "serves only to carry out authorities expressly conferred elsewhere in the code." *Purdue*, 144 S. Ct. at 2082 n.2 (quotation marks omitted).  Bankruptcy courts cannot "create substantive rights that are otherwise unavailable under applicable law," nor do they possess a "roving commission to do equity." *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003) (quotation omitted). Accordingly, any authority to include third-party releases in a plan must derive from some other source of law. Thus, the Bankruptcy Code does not change the state-law definition of consent as applicable to claims among non-debtor parties.[3]

16.     In *In re 4 West Holdings, Inc*., Judge Everett determined that because "there are no Federal Bankruptcy Rules or Federal Civil Rules that govern whether or not somebody can assent through silence to a deemed release" the Court must look to state law to determine whether opt out provisions are effective to confer consent to a third-party release.  *See* Transcript of Proceedings before the Honorable Scott W. Everett held on October 18, 2022, on Motion to Enforce Confirmation Order and Releases and Injunctions Thereunder, Case No. 18-30777-SWE-11, United States Bankruptcy Court for the Northern District of Texas, Docket Entry No. 2086, p. 7 at

---

[3] Indeed, even as to a debtor, it is well settled that whether parties have entered a valid settlement agreement is governed by state law.  *See Houston v. Holder (In re Omni Video, Inc.)*, 60 F.3d 230, 232 (5th Cir. 1995) ("Federal bankruptcy law fails to address the validity of settlements and this gap should be filled by state law."); *De La Fuente v. Wells Fargo Bank, N.A. (In re De La Fuente)*, 409 B.R. 842, 845 (Bankr. S.D. Tex. 2009) ("Where the United States is not a party, it is well established that settlement agreements in pending bankruptcy cases are considered contract matters governed by state law.").  That is because "the basic federal rule in bankruptcy is that state law governs the substance of claims, Congress having generally left the determination of property rights in the assets of a bankrupt's estate to state law." *Travelers Cas. & Sur. Co. of America v. Pacific Gas & Elec. Co.*, 549 U.S. 443, 450-451 (2007) (quotation marks omitted); *Butner v. United States*, 440 U.S. 48 (1979) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law.").

**UNITED STATES TRUSTEE'S OBJECTION TO CONDITIONAL
APPROVAL OF DISCLOSURE STATEMENT**                                      **Page 8**

ln. 1-6 (the "4 West Transcript").  Other courts have also recognized that because the Bankruptcy

Code does not govern relationships between claim holders and non-debtor third-parties, state-law

contract principles serve as controlling authority when considering whether a release is consensual.

*See, e.g.*, *Patterson v. Mahwah Bergen Retail Grp., Inc.,* 636 B.R. 641, 684-85 (E.D. Va. 2022)

(describing bankruptcy courts in the District of New Jersey as "look[ing] to the principles of

contract law rather than the bankruptcy court's confirmation authority to conclude that the validity

of the releases requires affirmative consent"); *Smallhold, Inc.*, No. 14-10267, 2024 WL 4296938,

at *11 (Bankr. D. Del. Sept. 25, 2024) (recognizing that "some sort of affirmative expression of

consent that would be sufficient as a matter of contract law" is required); *In re SunEdison, Inc.,*

576 B.R. 453, 458 (Bankr. S.D.N.Y. 2017) ("Courts generally apply contract principles in deciding

whether a creditor consents to a third-party release."); *In re Arrowmill Dev. Corp*., 211 B.R. 497,

506, 507 (Bankr. D.N.J. 1997) (explaining that a third-party release "is no different from any other

settlement or contract" and thus "the validity of the release . . . hinge[s] upon principles of straight

contract law or quasi-contract law rather than upon the bankruptcy court's confirmation order")

(internal quotation marks omitted) (alterations in original).  As one court recently held, because

"'nothing in the bankruptcy code contemplates (much less authorizes it)' . . . . any proposal for a

non-debtor release is an ancillary offer that becomes a contract upon acceptance and consent."  *In*

*re Tonawanda Coke Corp*., 662 B.R. 220, 222 (Bankr. W.D.N.Y. 2024) (quoting *Purdue*, 144 S.

Ct. at 2086).  Accordingly, "any such consensual agreement would be governed by state law."  *Id.*

17.     Here, the Debtors do not meet their burden of establishing that the releasing parties

will affirmatively agree to release their property rights in a manner sufficient to demonstrate

consent under state law.

---

### *Under State Law, Silence Is Not Acceptance*

18.     The "general rule of contracts is that silence cannot manifest consent."  *Patterson*,
636 B.R. at 686; *see also, e.g.*, *McGurn v. Bell Microproducts, Inc.*, 284 F.3d 86, 90 (1st Cir. 2002)
(recognizing "general rule" that "silence in response to an offer . . . does not constitute acceptance
of the offer").  Moreover, "[o]rdinarily[,] an offeror does not have power to cause the silence of
the offeree to operate as acceptance."  RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981);
*accord* 1 Corbin on Contracts § 3.19 (2018); 4 Williston on Contracts § 6:67 (4th ed.); *Reichert v.
Rapid Investments, Inc.*, 56 F.4th 1220, 1227 (9th Cir. 2022) ("[T]he offerer [sic] cannot prescribe
conditions so as to turn silence into acceptance.").  Instead, under state law, an agreement to release
claims—like any other contract—generally requires a manifestation of assent to that agreement.
*See, e.g.*, RESTATEMENT (SECOND) OF CONTRACTS § 17(1) ("[T]he formation of a contract requires
a bargain in which there is manifestation of mutual assent to the exchange and a consideration.").
Consent cannot be imputed or "deemed" based on a party's failure to object—rather, consent must
be affirmatively shown to exist.  *See, e.g.*, *id*.; RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt.
a.

19.     There are only very limited exceptions to that principle.  "[T]he exceptional cases
where silence is acceptance fall into two main classes: those where the offeree silently takes
offered benefits, and those where one party relies on the other party's manifestation of intention
that silence may operate as acceptance.  Even in those cases the contract may be unenforceable
under the Statute of Frauds."  RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).

20.     But absent such extraordinary circumstances, "[t]he mere receipt of an unsolicited
offer does not impair the offeree's freedom of action or inaction or impose on him any duty to
speak."  *Id.*  And "[t]he mere fact that an offeror states that silence will constitute acceptance does

not deprive the offeree of his privilege to remain silent without accepting." *Id.* § 69, cmt. c; *see also Patterson*, 636 B.R. at 686 (explaining how contract law does not support deeming consent based upon a failure to opt out).

21.    Both New York and Texas common law, as a point of reference, are in accord.[4] *See, e.g.*, *Advantage Physical Therapy v. Cruse*, 165 S.W.3d 21 (Tex. App. 2005) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 69 (1981)); *See, e.g., Hornberger Mgmt. Co. v. Haws & Tingle Gen. Contractors*, Inc., 768 A.2d 983, 991 (Del. Super. Ct. 2000) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 69 (1981))].  Absent limited exceptions not triggered here, silence and inaction are not assent to an offer.  See *Texas Ass'n of Ctys. Cty. Gov't Risk Mgmt. Pool v. Matagorda Cty.*, 52 S.W.3d 128, 131-33 (Tex. 2000) (quoting 2 Williston on Contracts § 6:49 (4th ed. 1991)**.** *See also Urban Green Techs., LLC v. Sustainable Strategies*, 2050 LLC, No. N136-12-115, 2017 WL 527565, at *3 (Del. Super. Ct. Feb. 8, 2017).  For the reasons discussed below, none of those exceptions apply here.

### ***Opt-out provisions are insufficient to confer consent to a third-party release.***

22.    Here, beyond the named parties, the Plan would impose the Third-Party Release on the following parties, without their affirmative consent: (i) all Holders of Claims or Interests that vote to accept the Plan and do not opt out[5]; (ii) all Holders of Claims or Interests that are deemed

---

[4] While the Plan provides that its construction and enforcement is governed by the laws of the State of New York, debtors cannot choose the law to apply to contracts between non-debtors.  Rather, ordinary choice of law principles govern which state's law applies to contracts between non-debtors, although a choice of law analysis may not be necessary absent any assertion that there is a difference in potentially applicable state laws governing what constitutes consent.  *See Smallhold*, 2024 WL 4296938, at *13 n.57.

[5] As noted above, the definition should be clarified, as it first lists among Releasing Parties anyone who votes to accept the Plan, but then states that an "Entity shall not be a Releasing Party if it: (x) elects to opt out of the Third Party Release; or (y) timely objects to the Third Party Release, either through (i) a formal objection filed on the docket of the Chapter 11 Cases or (ii) an informal objection provided to the Debtors by electronic mail, and such objection is not withdrawn on the docket of the Chapter 11 Cases or via electronic mail, as applicable, before Confirmation." *See* Plan, Article I.  The U.S. Trustee reserves all its rights to make further objections as to why a vote in favor of a plan is not consent to a third-party release if that reading of the provision is incorrect.

to accept the Plan and who do not affirmatively opt out of the releases provided in the Plan; (iii) all Holders of Claims or Interests that abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan; (iv) all Holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan; and (vii) each Related Party of each Entity in clause.

23.    An affirmative agreement—something more than a mere failure to opt out—is required for a non-debtor release to be consensual.  *See In re Tonawanda Coke Corp.*, 662 B.R. 220, 222-23 (Bankr. W.D.N.Y. 2024); *Patterson*, 636 B.R. at 686.  Failing to "opt out" of an offer is not a manifestation of consent unless one of the exceptions to the rule that silence is not consent applies, such as conduct by the offeree that manifests an intention that silence means acceptance or taking offered benefits.  RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).  For example, the *Patterson* court, in applying black letter contract principles to opt-out releases in a chapter 11 plan, found that contract law does not support consent by failure to opt-out.  *Patterson*, 636 B.R. at 686.  "Whether the Court labels these 'nonconsensual' or based on 'implied consent' matters not, because in either case there is a lack of sufficient affirmation of consent."  *Id.* at 688.

24.    The Ninth Circuit's decision in *Norcia*, cited with approval by the Fifth Circuit in *Imperial Ind. Supply Co. v. Thomas*, 825 F. App'x 204, 207 (5th Cir. 2020), illustrates the point. In *Norcia*, a consumer bought a Samsung phone from a Verizon Wireless store and signed the Verizon Wireless Customer Agreement.  *Norcia v. Samsung Telecomms Am., LLC*, 845 F.3d 1279, 1282 (9th Cir. 2017).  Among the contents of the phone's box was a Samsung "Product Safety & Warranty Information" brochure that contained an arbitration provision, which "stated that purchasers could opt out of the arbitration agreement by providing notice to Samsung within 30 calendar days of purchase, either through email or by calling a toll-free telephone number."  *Id*.  It

also stated that opting out would not affect the warranty coverage.  *Id*.  The customer did not take

any steps to opt out.  *Id*.  When the customer later sued Samsung, Samsung argued that the

arbitration provision applied.  *Id*. at 1282-83.

25.     As an initial matter, the *Norcia* court rejected the argument that the customer agreed

to the arbitration provision by signing his contract with Verizon: "The Customer Agreement is an

agreement between Verizon Wireless and its customer.  Samsung is not a signatory."  845 F.3d at

1290.  That is even more true in the context of a chapter 11 plan.  Not only are the non-debtor

released parties not signatories to it, a chapter 11 plan is a creature of the Bankruptcy Code

specifically for determining how the debtor will pay its creditors, not a contract to resolve claims

between non-debtors.  As the Ninth Circuit has explained, "[w]hen a bankruptcy court discharges

the debtor, it does so by operation of the bankruptcy laws, not by consent of the creditors . . . .

[T]he payment which effects a discharge is not consideration for any promise by the creditors,

much less for one to release non-party obligators."  *Blixseth v. Credit Suisse*, 961 F.3d 1074, 1085

(9th Cir. 2020) (quotation marks omitted).

26.     The Ninth Circuit in *Norcia* further held that the customer's failure to opt out did

not constitute consent to arbitrate.  Unsurprisingly—because there was no applicable federal law—

the court applied the "general rule," applicable under California law, that "silence or inaction does

not constitute acceptance of an offer."  845 F.3d at 1284 (quotation marks omitted); *accord Tex.*

*Ass'n of Ctys. Cty. Gov't Risk Mgmt. Pool v. Matagorda Cty*., 52 S.W.3d 128, 132–33 (Tex. 2000).

The customer did not agree to arbitrate because he did not "sign the brochure or otherwise act in a

manner that would show his intent to use his silence, or failure to opt out, as a means of accepting

the arbitration agreement."  *Norcia*, 845 F.3d at 1285 (quotation marks omitted).  This was true,

even though the customer *did* take action to accept the offered contract from Verizon Wireless.

"Samsung's offer to arbitrate all disputes with [the customer] cannot be turned into an agreement because the person to whom it is made or sent makes no reply, even though the offer states that silence will be taken as consent, unless an exception to this general rule applies."  845 F.3d at 1286 (quotation marks and citation omitted).

27.     The Ninth Circuit explained that there are two exceptions to this rule—when the offeree has a duty to respond, or when the offeree retains the offered benefits—but held neither exception applied.  *Norcia*, 845 F.3d at 1284-85.  There was no state law imposing a duty on the customer to act in response to the offer, the parties did not have a prior course of dealing that might impose such a duty, and the customer did not retain any benefits by failing to act given that the warranty applied whether or not he opted out of the arbitration provision.  *Id*. at 1286.

28.     Here, too, the debtor's creditors have not signed an agreement to release the non-debtor releasees nor acted in any other manner to suggest that their silence manifests an intention to accept an offer to release the non-debtors.

### ***Voting to accept a plan without opting out is not consent to release non-debtors.*** [6]

29.     *First*, voting for a plan without checking an opt-out box does not constitute the affirmative consent necessary to reflect acceptance of an offer to enter a contract to release claims against non-debtors.  *See* RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).

30.     As an initial matter, merely voting to approve a plan is not an expression of consent to a non-debtor release.  *See, e.g., In re Congoleum Corp.*, 362 B.R. 167, 194 (Bankr. D.N.J. 2007) ("[A] consensual release cannot be based solely on a vote in favor of a plan."); *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 507 (Bankr. D.N.J. 1997) (reaching same conclusion).  As explained in

---

[6] Should the Debtors instead intend to impose the release on those who accept the Plan regardless of whether those creditors opt out, the United States Trustee reserves her right to make further arguments against such provision.

**UNITED STATES TRUSTEE'S OBJECTION TO CONDITIONAL
APPROVAL OF DISCLOSURE STATEMENT**                                    **Page 14**

*Arrowmill*, a voluntary release arises only "because the *creditor agrees*" to it. 211 B.R. at 507 (emphasis in original). There is nothing in the Bankruptcy Code that authorizes treating a vote to accept a chapter 11 plan as consent to a third-party release. Instead, the "validity of th[at] release" necessarily "hinges upon principles of straight contract law or quasi-contract law rather than upon the bankruptcy court's confirmation order." *Id.* (citation and alterations omitted). Because "a creditor's approval of the plan cannot be deemed an act of assent having significance beyond the confines of the bankruptcy proceedings," "it is not enough for a creditor . . . to simply vote 'yes' as to a plan" in order to destroy its rights under nonbankruptcy law. *Id*. (quotation marks omitted); *accord Congoleum Corp.*, 362 B.R. at 194; *In re Digital Impact, Inc*., 223 B.R. 1, 14 (Bankr. N.D. Okla. 1998). Rather, a creditor must "unambiguously manifest[] assent to the release of the nondebtor from liability on its debt." *Arrowmill*, 211 B.R. at 507.

31.     Because merely voting to approve a plan does not manifest consent to a non-debtor release, such a vote plus a failure to opt out is still nothing more than silence with respect to the offer to release claims against non-debtors. Voting to accept a plan but remaining silent about a non-debtor release by failing to check an opt out box does not fit within any of the exceptions to the rule that silence is not acceptance of an offer.

32.     Creditors who vote for a plan without opting out of a non-debtor release are not "silently tak[ing] offered benefits" from the released non-debtors, such that consent may be inferred. RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981). The only benefits received by the creditors are distributions from the debtor's chapter 11 plan. Thus, "[e]ssentially, creditors are being asked to give releases to third parties for no consideration." *Tonawanda Coke Corp.*, 662 B.R. at 222. Thus, here, payment from a GUC Cash Pool that may range from $0.00 to $350,000.00, depending upon when the plan is confirmed, is not consideration for releases of non-

debtors.  Because creditors are entitled to whatever distributions the Plan allocates them regardless of whether they opt out of the non-debtor releases, consent to the non-debtor release cannot be inferred from mere acceptance of the benefits of the debtor's plan.  *See Norcia*, 845 F.3d at 1286 (explaining that customer's failure to opt out did not imply his consent where warranty applied regardless, meaning that customer did not thereby obtain any additional benefit).  Further, non-debtors have no right to prevent a debtor's creditors from receiving distributions under the debtor's chapter 11 plan, and thus acceptance of those distributions does not manifest acceptance of an offer to release non-debtors.  *See Railroad Mgmt. Co., L.L.C. v. CFS La. Midstream Co.*, 428 F.3d 214, 223 (5th Cir. 2005) ("In the absence of any evidence that Strong had the right to exclude CFS from the property in question or that CFS accepted any service or thing of value from Strong, no reasonable jury could conclude that CFS's failure to remove its pipeline upon Strong's demand constituted consent to a contract.").

33.    Nor does voting to approve a chapter 11 plan while remaining silent about a non-debtor release "manifest [an] intention that silence may operate as acceptance" of an offer to release claims against non-debtors.  RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a.  Because impaired creditors have a federal right under the Bankruptcy Code to vote on a chapter 11 plan, 11 U.S.C. § 1126(a), merely exercising that right does not manifest consent to release claims against non-debtors.  Rather, voting on a chapter 11 plan is governed by the Bankruptcy Code, and a favorable vote reflects only approval of the plan's treatment of the voters' claims *against the debtor*.

34.    And as in *Norcia*, creditors have no state law duty to respond to an offer to release non-debtors such that their silence can be understood as consent, nor have they any prior course of dealing with the released non-debtors that would impose such a duty.  *See Norcia*, 845 F.3d at

1285-86.  Nor do creditors have any affirmative obligation to act on a plan, either to vote or to opt

out.  *See, e.g.*, 11 U.S.C. § 1126(a) (providing that creditors "may" vote on a plan); *SunEdison,*

*Inc.*, 576 B.R. at 460–61 (recognizing that creditors have no duty to speak regarding a plan that

would allow a court to infer consent from silence).  A claimant's vote in favor of a plan while

remaining silent regarding a non-debtor release thus does not fit within the exception to the general

rule that consent cannot be inferred from silence.

35.    "[A]n offeree, regardless of apparent manifestation of his consent, is not bound by

inconspicuous contractual provisions of which he was unaware, contained in a document whose

contractual nature is not obvious."  *Norcia*, 845 F.3d at 1285 (quotation marks omitted); *Noble v.*

*Samsung Elec. Am., Inc.*, 682 F. App'x 113, 117-118 (3d Cir. 2017) (reaffirming that a person

cannot be presumed to have agreed to contractual provisions unless "there is a reasonable basis to

conclude that consumers will have understood the document contained a bilateral agreement").

Hence, voting for a plan does not reflect actual and knowing consent, particularly in the context of

"an immensely complicated plan" where "it would be difficult for any layperson to comprehend

all of its details."  *In re Congoleum Corp.*, 362 B.R. at 194.

### ***Voting to reject a plan without opting out is not consent to release non-debtors.***

36.    *Second*, for the same reasons, releases cannot be imposed on those who vote to

reject the plan but do not opt out.  It is implausible to suggest that a party returning a ballot rejecting

the plan but neglecting to opt out of the third-party release is evidencing consent to the third-party

release.  Not only is there no "mutual agreement" as to the plan, much less the third-party release,

the creditor has expressly stated its rejection of the plan.  As the court in *In re Chassix Holdings,*

*Inc.*, reasoned: "[A] creditor who votes to reject a plan should also be presumed to have rejected

the proposed third-party releases that are set forth in the plan.  *The additional 'opt out'*

*requirement, in the context of this case, would have been little more than a Court-endorsed trap for the careless or inattentive creditor.*"   533 B.R. 64, 79 (Bankr. S.D.N.Y. 2015) (emphasis added).

### <u>*Not voting and not opting out is not consent to release non-debtors.*</u>

37.     *Third*, even more obviously, as courts within this district have previously held, the releases cannot be imposed on those who do not vote and do not opt out.  *See Smallhold,* 2024 WL 4296938, at *2[7]; *SunEdison*, 576 B.R. at 458–61; *Chassix Holdings*, 533 B.R. at 81–82; *In re Wash. Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011).  This applies both to those creditors who simply abstain from voting and those creditors who are not entitled to vote on a plan.  Those who abstain from voting cannot be said to be consenting to anything—they are taking no action with respect to the plan.  The same is true for those who have no right to vote on a plan—whether an unimpaired creditor who is deemed to accept the plan or an impaired creditor receiving nothing under a plan who is deemed to reject the plan.  Creditors who do not vote on a plan do not manifest consent to a non-debtor release by failing to return an opt out form.

38.     Thus, after the Supreme Court's decision in *Purdue*, one Court in the Northern District of Texas[8] addressed whether the failure to exercise an "opt-out" is effective to constitute

---

[7] The United States Trustee recognizes that the court in *Smallhold* found that, in at least some circumstances, the act of voting on a debtor's plan (whether to accept or reject it) combined with a failure to exercise an opt-out option can constitute consent to a non-debtor release.  *See Smallhold,* 2024 WL 4296938, at *14.  The *Smallhold* decision, however, although stating it was applying "ordinary contract principles," 2024 WL 4296938, at *3, failed to faithfully apply those principles to the question of when silence can constitute consent.  For the reasons discussed above, contract principles do not support imputing consent for a third-party release based merely upon a creditor's neglect to exercise an opt-out option and that remains true even when that option is conspicuous or well-advertised.

[8] *Ebix* and its predecessor, *In re 4 West Holdings, Inc.*, interpret the contract law of the State of Texas. Texas's state contract law is similar to New York's state contract law. The laws of the State of Texas, whose law of contract is similar to New York's, have long held that silence does not equal consent sufficient to support the existence of a contract, except under limited circumstances not applicable in this case.  *See Texas Ass'n of Ctys. Cty. Gov't Risk Mgmt. Pool v. Matagorda Cty.*, 52 S.W.3d 128, 132-33 (Tex. 2000).

---

UNITED STATES TRUSTEE'S OBJECTION TO CONDITIONAL
APPROVAL OF DISCLOSURE STATEMENT                                                      **Page 18**

consent to third party releases at confirmation and in the context of a motion to enforce a confirmation order.[9]  In *In re Ebix, Inc.*, the Court denied the effectiveness of opt out third party releases for creditors who failed to return a ballot.  In disallowing the inclusion of the third-party release in the proposed plan, the Court noted "[n]othing in the Bankruptcy Code or Bankruptcy Rules provides for such relief, and under Texas contract law, that the parties agree governs the third-party release under the Debtors' proposed plan, silence does not equal the consent of the affected claimants on this record." *See In re Ebix, Inc. et al*, Transcript of Ruling on Amended Chapter 11 Plan, before the Honorable Scott W. Everett held on August 2, 2024, Case No. 24-80004-SWE-11, United States Bankruptcy Court for the Northern District of Texas. (the "Ebix Transcript").

39.     The *Ebix* ruling conforms to that Court's prior ruling on the permissibility and effectiveness of an opt out third-party release in *4 West Holdings*, where the court found that there had not been "a determination, either in the confirmation order or since, on whether, in fact, the opt-out releases are permitted by applicable law." *See 4 West* Transcript, pp. 5-6 at ln.19-2. *See also 4 West* Transcript, p. 13 at ln. 22-23.  Although in *Ebix* Judge Everett found those parties who returned a ballot—but failed to opt-out of the third-party release—consented to that release, the better view requires affirmative action to knowingly release third parties for the reasons discussed above.

40.     In *Ebix*, the Court stated "[o]nce consent is viewed from a contractual perspective, though, it is exceedingly difficult to construe the failure to opt out of a third-party release as valid

---

[9] As Judge Everett noted in *Ebix* and *4 West Holdings, Inc*., there are conflicting cases concerning the effectiveness of opt-out releases. *See Ebix* Transcript, p. 9 at 19, *4 West* Transcript, p. 3 at ln. 17-19.  Judge Everett further noted that while no other bankruptcy judge in the Northern District of Texas had written on the issue, the other four judges in the Northern District of Texas had approved opt-out release structures and that he, respectfully, was parting ways with his colleagues. *See 4 West* Transcript, p. 6 at ln. 14-16, *Ebix* Transcript, p. 5, ln. 8-11.

consent." *Ebix* Transcript, p. 15, ln. 18-20.  The Court found that silence does not equal consent

under Texas contract law and that none of the three exceptions to that principle—that assent to

contract is supported by the parties' course of conduct, that assent to contract arises where the

offeree accepts the benefit of the offer, and that assent to contract exists where the offeree misleads

the offeror and that the offeree, by remaining silent, intends to accept the offer—apply to the opt

out provisions in *Ebix*.  *See Ebix* Transcript p. 16-19, *See also 4 West* Transcript, pp. 18-19 at ln.

23 to 21.

41.     Judge Everett also rejected the notion that failing to opt out from a third-party

release is akin to a default under a complaint, failure to file a proof of claim timely, or failure to

respond to a claim objection.  "All of those examples involve specific Bankruptcy or Federal Civil

Rules that permit affirmative relief to be taken against a party if they fail to act.  Here, there are no

comparable rules providing for the result of a determination of deemed assent or consent to a

contractual release through silence."  *See 4 West* Transcript, pp. 20-21 at ln. 23-14.

42.     Thus, even where there are conspicuous warnings in the ballots or an opt out form

that silence or inaction will constitute consent to a release, that is not sufficient to recast a party's

silence as consent to the release. *SunEdison*, 576 B.R. at 458–61.  Just as creditors have no federal

or state law duty to vote on a plan, they also have no obligation to read a plan.[10]  And creditors

who have no intention of voting in the first place are unlikely to do so.  Moreover, parties who are

solicited but do not vote may have failed to vote for reasons other than an intention to assent to the

releases. *SunEdison*, 576 B.R. at 461.

43.     Thus, the court in *SunEdison* rejected the debtors' argument that the warning in the

disclosure statement and on the ballots regarding the potential effect of silence gave rise to a duty

---

[10] Here, the plan and associated materials, including the disclosure statement, run to at least 319 pages. *See*
Disclosure Statement, Docket No. 19.

**UNITED STATES TRUSTEE'S OBJECTION TO CONDITIONAL**
**APPROVAL OF DISCLOSURE STATEMENT**                                      **Page 20**

to speak, and the non-voting creditors' failure to object to or reject the plan should be deemed their consent to the release. *Id*. at 460–61. The court found that the nonvoting creditors' silence was not misleading and did not signify their intention to consent to the release (finding that silence could easily be attributable to other causes). *Id*. at 460-61.

44.     Simply put, "[f]ailing to return a ballot is not a sufficient manifestation of consent to a third-party release." *In re Wash. Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011); *see also Chassix Holdings*, 533 B.R. at 81–82. An "opt out mechanism is not sufficient to support the third-party releases . . . particularly with respect to parties who do not return a ballot (or are not entitled to vote in the first place)." *Wash. Mut., Inc.*, 442 B.R. at 355.

45.     "Charging all inactive creditors with full knowledge of the scope and implications of the proposed third-party releases, and implying a 'consent' to the third-party releases based on the creditors' inaction, is simply not realistic or fair and would stretch the meaning of 'consent' beyond the breaking point." *Chassix Holdings*, 533 B.R. at 81. "It is reasonable to require creditors to pay attention to what the debtor is doing in bankruptcy as it relates to the creditor's rights against the debtor. But as to the creditor's rights against third parties – which belong to the creditor and not the bankruptcy estate – a creditor should not expect that those rights are even subject to being given away through the debtor's bankruptcy." *Smallhold, Inc.*, 2024 WL 4296938, at *12; *see also id.* at *10 (discussing *Chassix*). As the court in *Emerge Energy Services, LP*, similarly explained, "[a] party's receipt of a notice imposing an artificial opt-out requirement, the recipient's *possible* understanding of the meaning and ramifications of such notice, and the recipient's failure to opt-out simply do not qualify" as implied consent through a party's silence or inaction. No. 19-11563, 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019) (emphasis in

original).  "[B]asic contract principles" require affirmative assent, not inferences drawn from inaction that in fact may reflect only "[c]arelessness, inattentiveness, or mistake." *Id.*

46.     Furthermore, failure to return an opt out form is not consent because—whether they are asked to vote or not—claimants have no reason to expect that an offer to contract with non-debtors will be included in the plan solicitation.  As the Third Circuit has explained, there can be no presumption that someone has agreed to contractual provisions of which they are "on notice," unless "there is a reasonable basis to conclude that consumers will have understood the document contained a bilateral agreement." *See Noble v. Samsung Elec. Am., Inc.*, 682 F. App'x 113, 117-118 (3d Cir. 2017).  *See also Norcia*, 845 F.3d at 1289 ("[N]o contract is formed when the writing does not appear to be a contract and the terms are not called to the attention of the recipient.") (quotation marks omitted).

47.     Importantly in this case, those receiving Non-Voting Notices do not receive the full solicitation package under the Solicitation Motion. While information concerning how to obtain a copy of the Disclosure Statement, the Plan, and other Plan documents is contemplated to be provided on the Non-Voting Notice, it is undisputed that those parties would not be provided sufficient notice in the form of the underlying documents which would have more fully disclosed the parameters of the plan provisions and releases from which they were expected to "opt out." Any party receiving a Non-Voting Notice would have to take affirmative action to obtain those documents in order to review and understand fully what was being asked of them.  Accordingly, the parties who received the Non-Voting Notice may not fully comprehend the extent of the third-party release due to a lack of notice.  The Court in *4 West Holdings, Inc.* similarly expressed concern about lack of notice.  *See 4 West* Transcript, p. 16 at ln. 2-7 (noting that there was no

evidence that the debtors in that case gave notice to the creditor of the bankruptcy filing, the plan
and the ballot).

### *There was insufficient notice of the non-debtor releases for there to be consent.*

48.     Finally, the definition of Released Parties here includes "Related Parties"—a list of
myriad different categories of people and entities.  The Plan makes no attempt to identify any
individual person or entity falling into any of these categories, meaning that the total universe of
the parties being released is unknown (and likely unknowable). Unless the "Related Parties" are
individually identified, there can be no plausible argument that a creditor has truly "consented" to
release that party, and thus, that the third-party release here is consensual.  There is no acceptance
of an offer when there is insufficient notice of the alleged contractual terms.  *See Norcia*, 845 F.3d
at 1285 ("[A]n offeree, regardless of apparent manifestation of his consent, is not bound by
inconspicuous contractual provisions of which he was unaware, contained in a document whose
contractual nature is not obvious.") (quotation marks omitted).

49.     Accordingly, the Court should strike the Third-Party Release provisions from the
Disclosure Statement and the Plan.

### **The exculpation provision is too broad in contravention of Fifth Circuit authority.**

50.     The Plan is also patently unconfirmable because, to the extent that applicable law
authorizes exculpations beyond 11 U.S.C. § 1125(e), the Plan's exculpation provisions are too
broad in contravention of Fifth Circuit precedent.

51.     The Plan defines "Exculpated Party" as:

"*Exculpated Party*" means collectively, and in each case, in its capacity as such: (a) the Debtors; (b) the Debtors' directors and officers who served at any time between the Petition Date and the Effective Date; (c) the managing members of those Debtors who are limited liability companies; (d) such Released Parties that are fiduciaries to the Debtors' Estates; (e) the Committee; (f) the members of the Committee in their capacity as such; (g) the individual Persons who served on the Committee on behalf of any member of the Committee; and (h) all Professionals retained by the Debtors and the Committee in these Chapter 11 Cases.

Plan at Article 1.

52.    The Fifth Circuit has affirmed that, in accordance with *Bank of New York Trust Company, NA v. Official Unsecured Creditors' Committee (In re Pacific Lumber Co.)* 584 F.3d 229 (5th Cir. 2009), and section 524(e) of the Bankruptcy Code, "any exculpation in a Chapter 11 reorganization plan [must] be limited to the debtor, the creditors' committee and its members for conduct within the scope of their duties, 11 U.S.C. § 1103(c), and the trustees within the scope of their duties . . . ." *NexPoint Advisors, L.P. v. Highland Cap. Mgmt. L.P., (In re Highland Cap. Mgmt., L.P.),* 48 F.4th 419, 437 (5th Cir. 2022)("*Highland Capital*").

53.    Specifically, the Fifth Circuit in *Highland Capital* analyzed whether the independent directors, who were specifically appointed to act together similar to a bankruptcy trustee, could be exculpated and concluded that they could because they "were entitled to all the rights and powers of a trustee."  48 F.4th at 437.

54.    The Fifth Circuit in *Highland Capital* then rejected any exculpation for the debtors' employees, officers, directors, and professionals:

> As it stands, the Plan's exculpation provision extends to Highland Capital and its employees and *CEO*; Strand; the Reorganized Debtor and HCMLP GP LLC; the Independent Directors; the Committee and its members; the Claimant Trust, its trustee, and the members of its Oversight Board; the Litigation Sub-Trust and its trustee; professionals retained by the Highland Capital and the Committee in this case; and all "Related Persons." *Consistent with § 524(e), we strike all exculpated parties from the Plan except Highland Capital, the Committee and its members, and the Independent Directors*.

*Highland Capital,* 48 F.4th at 438 (emphasis added).

55.     The list of Exculpated Parties in the Plan exceeds what is permissible under the law of this Circuit.[11]   Specifically, the Plan includes the following exculpated parties that are not allowed to be exculpated under Fifth Circuit law:  the Debtors' directors and officers who served at any time between the Petition Date and the Effective Date; the managing members of those Debtors who are limited liability companies; such Released Parties[12] that are fiduciaries to the Debtors' Estates; and all Professionals retained by the Debtors and the Committee in these Chapter 11 Cases. (defining "Exculpated Parties").[13]

56.     Accordingly, the court should deny to conditionally approve the Disclosure Statement in support of a plan that contains an Exculpation that does not comport with the Fifth Circuit's direction in *Highland Capital.*

---

[11] The third-party release here includes each Debtor, Post-Effective Date Debtor, and each Transferred Entity, as applicable; each Consenting Term Loan Lender, the DIP Lenders, the DIP Agent, the Prepetition Term Loan Lenders, and the Prepetition Agent; the ACO Purchaser, the Core Centers Purchaser, the Stalking Horse Purchaser; the Committee and its members, each in their capacities as such; and related parties of those entities, which includes a panoply of other entities such as "current and former directors, managers, officers, Committee members, members of any Governing Body, equity holders (regardless of whether such Interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors, in each case solely in their capacities as such, and any such Person's or Entity's respective heirs, executors, estates, and nominees." *See* Plan, Article I.  It appears that the Debtors are seeking to impose the Third-Party Release upon creditors to release and exculpate the directors, officers, and professionals that cannot be exculpated under the Fifth Circuit's decision in *Highland Capital.*

[12] Released Parties is defined in Article I of the Plan.  The definition of Released Parties includes Related Parties, which is also defined in Article I of the Plan, of such entities.

[13] Furthermore, the Plan's purported release and exculpation of estate professionals is unnecessary because such professionals are protected by fee review under section 330 of the Bankruptcy Code, under which the Court evaluates the reasonableness of a professional's services, including whether such services were necessary to the administration of the estate or beneficial at the time the services were rendered.  The Fifth Circuit has held that a final award of professional fees is *res judicata* as to professional malpractice claims.  *Osherow v. Ernst & Young (In re Intelogic Trace, Inc.),* 200 F.3d 382, 387-88 (5th Cir. 2000).  Moreover, the current provision could be read to restrict the ability of parties to object to professional fees under 11 U.S.C. § 330.

**UNITED STATES TRUSTEE'S OBJECTION TO CONDITIONAL
APPROVAL OF DISCLOSURE STATEMENT**                                    **Page 25**

***The Plan imposes a sweeping injunction to enforce the nonconsensual Third-Party Release and exculpation that is not authorized under the Bankruptcy Code.***

57.     The Plan is also patently unconfirmable because it includes an injunction enforcing the Third-Party Release and exculpation.  But *Purdue* stands for the proposition that non-consensual third-party releases and injunctions are not permitted by the Bankruptcy Code.  *See Purdue*, 144 S.Ct. at 2088.  As the *Purdue* court noted, the Bankruptcy Code allows courts to issue an injunction in support of a non-consensual, third-party release in exactly one context:  asbestos-related bankruptcies, and these cases are not asbestos-related.  *See Purdue*, 144 S. Ct. at 2085 (citing 11 U.S.C. § 524(e)).

58.     Even if releases between non-debtors are consensual, there is no Bankruptcy Code provision that authorizes chapter 11 plans or confirmation orders to include injunctions to enforce them.  Further, such an injunction is not warranted by the traditional factors that support injunctive relief.  A party seeking an injunction "must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("An injunction should issue only where the intervention of a court of equity 'is essential in order effectually to protect property rights against injuries otherwise irremediable.'") (quoting *Cavanaugh v. Looney*, 248 U.S. 453, 456 (1919)); *id*. (noting that an injunction is an "extraordinary remedy").  The Debtors have made no attempt to show that any of these factors are met.  Nor could they.  If the release is truly consensual, there is no threatened litigation and no need for an injunction to prevent irreparable harm to either the estates or the released parties.  A consensual release may serve as an affirmative defense in

any ensuing, post-effective date litigation between the third-party releasees and releasors, but there is no reason for this Court to be involved with the post-effective date enforcement of those state-law releases.  Moreover, this injunction essentially precludes any party deemed to consent to the Third-Party Release from raising any issue with respect to the effectiveness or enforceability of the release (such as mistake or lack of capacity) under applicable non-bankruptcy law.

59.     Similarly, there is no statutory authority in the Bankruptcy Code that justifies an injunction to enforce an exculpation, and the Debtors have shown no need for an injunction to prevent "irreparable harm" to either the estates or the released parties.

### *The Disclosure Statement and Plan should clarify that claims of governmental entities are not released.*

60.     The "police and regulatory power" exception to the automatic stay found at 11 U.S.C. § 362(b)(4) is designed to ensure that the stay "does not impede government's ability to protect public health and safety." *In re Wyly*, 526 B.R. 194, 198 (Bankr. N.D. Tex. 2015). Preserving governmental entities ability to protect public health and safety is particularly important in the context of a healthcare company.

61.     The Disclosure Statement does not contain adequate information as to whether governmental police and regulatory powers are preserved. The Debtors should modify the Disclosure Statement and Plan to clarify that no party shall be released from any causes of action or proceedings brought by any governmental entity in accordance with its regulatory functions, including but not limited to criminal and environmental matters.  The United States Trustee requests that the Debtors include the following language in the Plan:

> Nothing in the Confirmation Order or the Plan shall effect a release of any claim by the United States Government or any of its agencies or any state and local authority whatsoever, including without limitation any claim arising under the Internal Revenue Code, the

environmental laws or any criminal laws of the United States or any state and local authority against any party or person, nor shall anything in the Confirmation Order or the Plan enjoin the United States or any state or local authority from bringing any claim, suit, action, or other proceedings against any party or person for any liability of such persons whatever, including without limitation any claim, suit or action arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against such persons, nor shall anything in the Confirmation Order or the Plan exculpate any party or person from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against any party or person.

## Conclusion

Wherefore, the United States Trustee respectfully requests that the Court deny to conditionally approve the Disclosure Statement and grant to the United States Trustee such other and further relief as is just and proper.

DATED: December 11, 2024                    Respectfully submitted,

                                            LISA L. LAMBERT
                                            UNITED STATES TRUSTEE
                                            */s/ Meredyth A. Kippes*
                                            Meredyth A. Kippes
                                            Trial Attorney
                                            Texas State Bar No. 24007882
                                            Office of the United States Trustee
                                            1100 Commerce Street, Room 976
                                            Dallas, Texas  75242
                                            (214) 767-1079
                                            meredyth.kippes@usdoj.gov

## Certificate of Service

The undersigned counsel certifies that copies of the foregoing document were served on December 11, 2024 via ECF to those parties requesting service via ECF in this case and to the parties listed below via electronic mail.

*/s/  Meredyth A. Kippes*
Meredyth A. Kippes

CareMax, Inc.
1000 NW 57 Court, Suite 400
Miami, Florida 33126
Attn: Paul Rundell, Chief Restructuring
Officer
prundell@alvarezandmarsal.com

SIDLEY AUSTIN LLP
Thomas R. Califano (24122825)
Juliana L. Hoffman (24106103)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
tom.califano@sidley.com
jhoffman@sidley.com

SIDLEY AUSTIN LLP
Stephen E. Hessler
Anthony R. Grossi
Jason L. Hufendick
787 Seventh Avenue
New York, New York 10019
shessler@sidley.com
agrossi@sidley.com
jhufendick@sidley.com

Boris I. Mankovetskiy
Sill Cummis & Gross P.C.
The Legal Center, One Riverfront Plaza
Newark, NJ 07102
bmankovetskiy@sillscummis.com

Robert J. Feinstein
Pachulski Stang Ziehl & Jones LLP
780 Third Avenue, 34th Floor
New York, NY 10017
rfeinstein@pszjlaw.com

Bradford J. Sandler
Pachulski Stang Ziehl & Jones LLP
780 Third Avenue, 34th Floor
New York, NY 10017
bsandler@pszjlaw.com

Michael D. Warner
Pachulski Stang Ziehl & Jones LLP
735 Plaza Blvd., Suite 200
Coppell, TX 75019

Michael D. Warner
Pachulski Stang Ziehl & Jones LLP
700 Louisiana Street, Suite 4500
Houston, TX 77002
mwarner@pszjlaw.com