Michael D. Warner, Esq. (TX Bar No. 00792304)
Benjamin L. Wallen, Esq. (TX Bar No. 24102623)
PACHULSKI STANG ZIEHL & JONES LLP
700 Louisiana Street, Suite 4500
Houston, TX 77002
Telephone:  (713) 691-9385
Facsimile: (713) 691-9407
Email:   mwarner@pszjlaw.com
          bwallen@pszjlaw.com

Bradford J. Sandler, Esq. (admitted *pro hac vice*)
Robert J. Feinstein, Esq. (admitted *pro hac vice*)
PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 34th Floor
New York, NY 10017
Telephone: (212) 561-7700
Facsimile:  (212) 561-7777
Email:   bsandler@pszjlaw.com
          rfeinstein@pszjlaw.com

Andrew H. Sherman, Esq. (*pro hac vice* forthcoming)
Boris I. Mankovetskiy, Esq. (*pro hac vice* forthcoming)
SILLS CUMMIS & GROSS P.C.
The Legal Center
One Riverfront Plaza
Newark, NJ 07102
Telephone: (973) 643-7000
Facsimile: (973) 643-6500
Email: asherman@sillscummis.com
          bmankovetskiy@sillscummis.com

*Proposed Counsel to the*
*Official Committee of Unsecured Creditors*

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| CAREMAX, INC., *et al.*,[1] | Case No. 24-80093 (MVL) |
| Debtors. | (Jointly Administered) |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO (A) DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN OF CAREMAX, INC. AND ITS DEBTOR AFFILIATES AND (B) THE DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) SCHEDULING A COMBINED DISCLOSURE STATEMENT APPROVAL AND PLAN CONFIRMATION HEARING; (II) CONDITIONALLY APPROVING THE DISCLOSURE STATEMENT; (III) ESTABLISHING A PLAN AND DISCLOSURE STATEMENT OBJECTION DEADLINE AND RELATED PROCEDURES; (IV) APPROVING THE SOLICITATION PROCEDURES; (V) APPROVING THE COMBINED NOTICE AND PATIENT COMBINED NOTICE; AND (VI) GRANTING RELATED RELIEF**

---

[1]  A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/CareMax. The Debtor's service address is 1000 NW 57 Court, Suite 400, Miami, Florida 33126.

The Official Committee of Unsecured Creditors (the "Committee") appointed in the above-caption cases (the "Chapter 11 Cases") pursuant to section 1102(a) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), files this Objection (the "Objection") to the following:

- *Disclosure Statement for the Joint Chapter 11 Plan of Caremax, Inc. and Its Debtor Affiliates* [Docket No. 19] (the "Disclosure Statement"); and

- *Debtors' Emergency Motion for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing; (II) Conditionally Approving the Disclosure Statement; (III) Establishing a Plan and Disclosure Statement Objection Deadline and Related Procedures; (V) Approving the Combined Notice and Patient Combined Notice; and (IV) Granting Related Relief* [Docket No. 20] (the "Solicitation Motion").[2]

In support of its Objection, the Committee respectfully represents:

### PRELIMINARY STATEMENT

1.      Courts should only approve disclosure statements on an expedited basis under the concept of conditional approval and continue the debtor's burden to demonstrate adequate information concurrent with confirmation of a plan under rare instances. Otherwise, courts run the risk that the momentum of confirmation will overtake the requirement that a disclosure statement contain adequate information – a risk courts should accept only when circumstances are appropriate. Notwithstanding conditional approval, it is still mandatory that the debtor provides sufficient information that permits the consideration of the plan at the time of voting. This procedure should be the exception not the rule. These Chapter 11 Cases do not warrant the expedited process of conditional approval of the Disclosure Statement, nor have the Debtors provided creditors asked to vote on their Plan sufficient information to assess the Plan prior to or concurrent with voting.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Disclosure Statement or Solicitation Motion, as applicable.

2.      Placing these Chapter 11 Cases on a fast track towards confirmation solely because the Prepetition Term Loan Lenders (the "Lenders") desire such speed, does not, in and of itself, create a basis to abbreviate the disclosure statement approval process at the expense of unsecured creditors and other parties in interest.  More should have to be presented to warrant the delay in the determination that the Disclosure Statement contains adequate information until confirmation. And in their desire for maximum speed, the Debtors run the risk that final approval of their Disclosure Statement is not granted due to material deficiencies such that the plan process will fail at great expense to the estates and creditors.  The Disclosure Statement fails, in this regard, to disclose material facts relevant to creditors asked to vote on the Plan and determine whether to agree to or reject the proposed third-party Releases in the Plan.

3.      The Debtors filed their proposed Plan and Disclosure Statement on the first day of these cases in accordance with a Restructuring Support Agreement ("RSA") between the Debtors and the Lenders negotiated without any input from unsecured creditors.  The Plan does not contemplate the reorganization of any of the Debtors, but rather effectuates (a) a liquidation of the Debtors' primary business lines with all proceeds going to the Lenders, and (b) the granting of gratuitous debtor and third-party releases to a litany of players, including the Debtors, their Lenders, their respective officers, directors, professionals and others. As set forth herein, the Disclosure Statement utterly fails to explain why **_any_** releases are necessary, appropriate or beneficial in a liquidation case. Nor is there any explanation of what claims are being released against the various proposed releasees or what consideration is being provided to the Debtors (there is none) in exchange for the blanket release of all claims against the long list of Releasees.

4.      The Debtors are moving at breakneck speed through the process of marketing and selling their assets and prosecuting confirmation of the Plan.  Two negative consequences flow

from this. First, the sale process is projected to yield less than what is needed to satisfy the Lenders' claims, and second, there is precious little time before the proposed date of Plan confirmation (January 28, 2025, just over a month from now) when releases will be issued to conduct an investigation of a long list of suspect prepetition transactions which the Debtors now acknowledge were financially problematic. This includes an acquisition of certain of the Debtors' primary operating assets in the VBC Sale Transaction from Steward (as defined herein) two years ago when Steward was represented by the Debtors' proposed bankruptcy counsel (a clear conflict that disables the firm from conducting an independent investigation of the transaction in which it participated).

5. Underscoring the Debtors' and Lenders' motives to push forward their Plan and roll over unsecured creditors owed approximately $160 million, the proposed Plan proposes a paltry, capped recovery of $350,000 (an estimated recovery of less than a quarter of one percent) that is ***expressly conditioned upon confirmation of the Debtors' Plan on its mandated expedited schedule and subject to reduction to the point of elimination if that schedule is disturbed***. This death trap provision is no doubt intended to handcuff the Committee from conducting a thorough investigation of the Debtors' officers and directors and the Lenders who are being granted broad releases upon confirmation.

6. The Committee objects to the Solicitation Motion and the Disclosure Statement on several grounds including the following:

- **The Alleged 9019 Settlement and Debtor and Third Party Releases are Unsupported**. The Disclosure Statement recites in boilerplate fashion that confirmation of the Plan will constitute the Court's approval of a compromise settlement under Bankruptcy Rule 9019. The Disclosure Statement, however, is devoid of *any* discussion as to exactly what claims are being settled, against whom those claims could be asserted, or what consideration the estates are receiving as consideration for the expansive Releases to be granted to the litany of Released Parties. Since the Disclosure Statement contains nothing but conclusory language

4

that fails to identify any claims being settled or the consideration therefor, lacks any discussion of the standards for approval of a settlement pursuant to Rule 9019; nor contains any discussion of the facts the Court is required to consider to approve non-debtor third-party releases in this Circuit – such as the consideration being paid by the Released Parties or why such Releases are even necessary, given that the Plan is nothing more than an orderly foreclosure being conducted for the benefit of the Lenders – the Disclosure Statement cannot be deemed to contain adequate information.

- **The Plan is not a restructuring**. The Disclosure Statement misleadingly refers to the Plan as effectuating a restructuring when it is nothing of the sort. The Plan is a controlled liquidation of all the Debtors' assets. To label it otherwise is misleading and appears to be a semantic attempt to support the Plan's broad release and injunction provisions and the Debtors' effort to achieve a *de facto* discharge to which they are not entitled in a liquidation case (*see* section 1141(d)(3) of the Bankruptcy Code).

- **The Opt-Out Provision is improper**. The requirement that Releasing Parties expressly opt-out of the Releases or otherwise be bound by them is impermissible. The Bankruptcy Code does not contain any provisions enabling the Debtors to deem a non-debtor release consensual and such deemed consent is not authorized by applicable state law. Post-*Purdue*, creditors should not be required to take affirmative action to deny their consent to a waiver of their rights and claims.

7.     As set forth herein, the Disclosure Statement fails in other respects to contain adequate information as required by the Bankruptcy Code and should not be approved at this time, even on a preliminary basis. The Court should deny approval of the Disclosure Statement, or in the alternative, require the Debtors to file a substantially amended Disclosure Statement that contains adequate information before solicitation may commence. Additionally, the solicitation procedures are deficient as set forth below and should be addressed to avoid disenfranchising creditors entitled to vote on the Plan. The Solicitation Motion should be denied unless the various objections set forth herein are properly addressed.

## **BACKGROUND**

### A.     **General Background**

8.     On November 17, 2024 (the "Petition Date"), each of the Debtors filed a voluntary petition with this Court under chapter 11 of the Bankruptcy Code. The Debtors are operating their

businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Chapter 11 Cases.

9.      The Debtors filed their Plan and Disclosure Statement on the Petition Date, along with a number of First Day Motions, including the Solicitation Motion.

10.      On November 19, 2024, the Court held a first-day hearing, in which the Debtors requested interim relief on, among other motions, their DIP  financing motion.  In addition, the Debtors sought approval on a final basis of the Bid Procedures Motion and the ACO TSA Motion. Through these motions, the Debtors sought approval of certain aggressive milestones, including: (a) final approval of the DIP Motion by December, 19, 2024; (b) notice of Qualified Bidders for the sale of the Debtors assets by December 28, 2024; (c) receipt of bids by January 1, 2025; (d) an Auction to be held on January 6, 2025; and (e) confirmation of their Plan by a mere 72 days from the Petition Date, or January 28, 2025.

11.      On December 4, 2024, the Office of the United States Trustee appointed the Committee, comprising the following five members: (a) THFF REIT LLC; (b) Foresee Medical, Inc.; (c) Pharmalife Consulting, LLC; (d) Connect C3; and (e) Apex Place PH, LLC.   The Committee first met on Friday, December 6, 2024.

12.      Recognizing that time was of the essence, the Committee worked diligently through the weekend interviewing counsel.   Early Saturday evening, December 7, 2024, the Committee selected Pachulski Stang Ziehl & Jones LLP and Sills Cummis & Gross P.C. (collectively, "Committee Counsel"), as counsel to the Committee.

13.      On December 10, 2024, the Committee selected M-3 Partners as the Committee's financial advisor.

B.      **The Plan in General**

14.      The Plan and RSA were designed to effectuate and consummate the sales of the Debtors' managed-services organization business (the "MSO Business") and non-MSO clinical care centers.  Other than administrative clean-up, the post-Effective Date Debtors will have no business operations as all those will have been sold as of the Effective Date.  In short, the Debtors are liquidating their assets in chapter 11, not reorganizing or restructuring any of their businesses (as the Debtors repeatedly misstate).  While use of chapter 11 to effectuate an orderly liquidation is not impermissible, the process does not come with non-debtor releases and a discharge because those bonus protections are designed to protect the integrity of a fresh start for a reorganizing debtor, not shield the officers, directors and lenders of an entity that will cease operations.

15.      The Debtors' primary business lines are an MSO Business acquired from Steward Health Care Systems LLC ("Steward")[3] in November 2022 pursuant to the so-called VBC Sale Transaction[4] and non-MSO clinical care centers through which the Debtors offer a range of medical services, referred to as the Core Centers business.  The Debtors' MSO Business is primarily operated through three Accountable Care Organizations or "ACOs."  The proposed transaction contemplates the sale of the MSO Business to RHG Network LLC ("RHG"), an affiliate of Revere Medical.  RHG is an affiliate of Brady Health Buyer LLC, the entity that purchased the related assets out of the Steward bankruptcy cases.  Thus, the Plan contemplates the

---

[3] Steward is subject to its own chapter 11 proceeding [U.S. Bankr. Court, S.D. Tex., Case No. 24-90213 (CML)] – a messy case plagued with allegations of massive fraud which resulted in Congressional hearings and a contempt citation against Steward's now-resigned Chairman and CEO, Ralph de la Torre, who also happens to be on the Board of Directors of the Debtors.  Mr. de la Torre is alleged, among other things, to have engaged in illegal international activities and diverted funds from Steward to himself and his other companies to fund a lavish lifestyle at the expense of patients.  *See, e.g.,* https://www.statnews.com/2024/09/29/steward-health-care-ceo-ralph-de-la-torre-will-resign/
[4] Steward was represented in the VBC Sale Transaction by Sidley Austin LLP (https://ir.caremax.com/news/news-details/2022/CareMax-Inc.-to-Acquire-Medicare-Value-Based-Care-Business-of-Steward-Health-Care-System/default.aspx), who is the Debtors' proposed section 327(a) bankruptcy counsel.  No other law firm has appeared for the Debtors in these cases so the apparent conflict presented by Sidley's prior representation of Steward in connection with the 2022 sale to the Debtors is unremedied.

reversal of the VBC Sale Transaction consummated just two years ago (when Debtors' proposed

counsel was representing Steward on the other side of the table from the Debtors).

16.     Both the Lenders and RHG, along with the Debtors, are the parties to the RSA,

which is designed to effectuate and consummate the ACO transaction "alongside" the Core Centers

sale.  Related to these transactions is the ACO TSA, which the Debtors seek to assume as more

fully set forth in the ACO TSA Motion.[5]

17.     Unsecured creditors are slated to receive minimal or **_no_** distribution under the Plan

depending upon when it is confirmed.  In the Plan, the Debtors expressly threaten that if the

unsecured creditors (or the Committee) do anything to derail the preset timeline dictated by the

Debtors, the Lenders (who are also DIP Lenders) and RHG, even that pittance will be taken away.

## ARGUMENT AND AUTHORITIES

A.     **The Disclosure Statement Does Not Contain Adequate Information**

18.     The proposed Disclosure Statement does not contain information sufficient to allow

unsecured creditors to make an informed decision whether to accept or reject the Plan, and in some

instances, contains incomplete, inaccurate or misleading information.  The Disclosure Statement

should be amended to address these deficiencies raised below, failing which the Court should not

authorize its dissemination.

19.     "Disclosure is the 'pivotal' concept in Chapter 11 reorganization." *Kunica v. St.

Jean Fin., Inc.*, 233 B.R. 46, 54 (S.D.N.Y. 1999) (*citing* 5 Lawrence P. King, COLLIER ON

BANKRUPTCY ¶ 1125.03 (15th ed. 1992)).  A disclosure statement is the primary source of

information creditors and other parties in interest rely on in making informed decisions about a

---

[5] *Debtors' Motion for Entry of an Order (I) Authorizing and Approving (A) Assumption of and Performance of Obligations Under the ACO TSA, and (B) the ACO Break-Up Fee; And (II) Granting Related Relief* [Docket No. 23] (the "ACO TSA Motion").  The existence of the TSA is further proof that the Debtors are not restructuring the ACO business, they are selling it and employing a TSA to assist the buyer.

debtor's plan of reorganization. *Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion)*, 844 F.2d 1142, 1157 (5th Cir. 1988). Full disclosure is fundamental to the proper functioning of the bankruptcy process:

> The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court. Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of "adequate information."

*Oneida Motor Freight, Inc. v. United Jersey Bank,* 848 F.2d 414, 417 (3d Cir. 2013); *see also Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996) ("Because creditors and the bankruptcy court rely heavily on the debtor's disclosure statement in determining whether to approve a proposed reorganization plan, the importance of full and honest disclosure cannot be overstated.").

20.    In determining whether a plan proponent has provided "adequate information" to creditors and parties in interest, the standard is not whether the failure to disclose information would harm creditors but whether "hypothetical reasonable investors receive such information as will enable them to evaluate for themselves what impact the information might have on their claims and on the outcome of the case, and to decide for themselves what course of action to take.*" In re Applegate Prop., Ltd.,* 133 B.R. 827, 831 (Bankr. W.D. Tex. 1991).

21.    Adequate information is defined by the Bankruptcy Code as: "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan...." *See* 11 U.S.C. § 1125(b).

22.    No such adequate information is contained in the Disclosure Statement. What is most striking about the Debtors' proposed Disclosure Statement is that everything of substance is

missing.  While the Disclosure Statement contains pages of information on the history of the

Debtors, little disclosure is made about the background to the Plan sale transaction which

effectively reverses the 2022 VBC Sale Transaction.  Nor is there any disclosure regarding any of

the following:

- What potential claims against the Released Parties are being investigated by the Independent Director?[6]  Who are the targets and what are the potential legal theories of recovery?
- According to the Disclosure Statement, the Independent Director is represented by the Debtors' proposed section 327(a) counsel, Sidley Austin LLP.  There is no explanation as to how Sidley can investigate Steward, its former client, independently and without conflict when it represented Steward in the transaction it is investigating.
- What is the value of the potential claims against non-debtors to be released under the Plan?
- What, if any, consideration is being provided to the estates in exchange for the Releases?  If they are gratuitous releases, what conceivable justification could there be for granting them?
- How could the Releases be necessary to the reorganization when the Debtors are not reorganizing.

**B.**     **The Disclosure Statement Contains no Information in Support of the Releases.**

23.     The Plan contains broad general releases of a litany of parties and their

professionals (including Debtors' counsel), as well as what purports to be consensual non-debtor

third party releases.  However, the Debtors provide no substantive information about the claims to

be released, but rely instead on generic statements and recitation of boilerplate terms, thus

depriving creditors of the relevant facts from which they can exercise informed consent.  If a

release is to be at all consensual, the Debtors have an obligation to disclose to creditors what claims

---

[6] The term "Independent Director" is defined in the Disclosure Statement, but not the Plan.  Both terms "Disinterested Director" and "Independent Director" are utilized in the Disclosure Statement, but the Plan makes no mention of the Independent Director.  It appears that both terms are defined to refer to Edward Borkowski, identified as the "disinterested director" of CareMax, Inc.  It's not clear why two different terms are used or if there is an intended distinction between the Disinterested Director and Independent Director.

are being released, the basis for the release and the consideration being paid for it.[7]  The Disclosure

Statement pays lips service to this requirement by stating merely that:

> Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases contained in Article IX.B of the Plan, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third Party Releases are: (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties that is important to the success of the Plan; (d) a good faith settlement and compromise of the Claims released by the third-party releases; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to Article IX.B of the Plan.

Disclosure Statement, Art. XI.B at p. 61.  However, the support for these conclusory statements is

*nowhere* to be found in the Disclosure Statement.

24.     The Disclosure Statement fails to describe the potential claims and causes of action

that are being released by the estates pursuant to the Releases;[8] whether any investigations were

previously performed or in the case of the investigations allegedly being performed by the

Independent Director, the status and findings of such investigations; the nature and value of the

claims being released and exculpated; the availability of insurance coverage for any such claims;

---

[7] For example, in *In re Fieldwood Energy LLC*, 2021 Bankr. LEXIS 1829, *50 (Bankr. S.D. Tex. June 25, 2021), at the confirmation hearing the bankruptcy court made express findings regarding the evidence presented in support of the consensual releases referencing (i) the consideration paid for the releases; (ii) the consent of the parties to the releases after appropriate disclosure and notice; (iii) the substantial benefit conferred on the estate from the releases; (iv) that the releases were tailored to the facts and circumstances of the case; (v) that the releases were integral to the formulation and implementation of the plan; (vi) that the releases were fair and equitable; and (vii) that the releases were negotiated in good faith.  2021 Bankr. LEXIS 1829, *45-50.  Information supporting these findings was contained in the debtors' disclosure statement so that creditors could make an informed decision whether or not to opt out of the releases.  *See, e.g.*, *In re Fieldwood Energy LLC*, Case No. 20-33948 (Bankr. S.D. Tex.), *Disclosure Statement for Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* [Docket No. 1285] at Art. V.N, pp. 45-46 ("Independent Investigation" discussing results of investigation by independent director of certain transactions involving officers and directors) and Art. VI.B, pp. 50-51 ("Approval of Apache Transactions" discussing basis, benefits and consideration for settlement with major party in interest and related releases).

[8] The Liquidation Analysis filed by the Debtors does not identify or value *any* potential causes of action.

and the basis for the Debtors' assertion that the Releases are necessary to the reorganization[9] of

the Debtors.

25.     The Debtors acknowledge that an investigation must be made into potential causes

of action.  Specifically, the Debtors recognize that any investigation of the VBC Sale Transaction

is infected with conflicts and have informed Committee Counsel that they are conducting an

investigation (albeit a highly expedited one) of various matters, including, presumably the VBC

Sale Transaction, through Independent Director, Edward Borkowski.  However, the scope of Mr.

Borkowski's investigations are not clearly articulated in the Disclosure Statement or anywhere

else, and while he generically is looking into the proposed Plan releases, he does not have

independent counsel.[10]

26.     All of this information must be contained in the Disclosure Statement: the scope of

the Independent Director's investigations, the details and results of the investigations, the value of

or lack of value of any potential causes of action and the bases for these conclusions, and the

justification for the Independent Director's utilization of the same counsel who is conflicted by

having represented the counter-party in the transaction under investigation.  Failing  that, the

Disclosure Statement fails to contain adequate information as required by the statute.

---

[9]  As noted, the Debtors are liquidating all of their assets, not reorganizing, begging the question of why *any* releases
are necessary or appropriate.

[10] The "Disinterested Director may not so designate the Purchasers (including the Stalking Horse Purchaser, as
applicable), the Consenting Term Loan Lenders, the Prepetition Term Loan Lenders, the Prepetition Agent, the DIP
Lenders, or the DIP Agent, and the Purchasers, the Consenting Term Loan Lenders, the Prepetition Term Loan
Lenders, the Prepetition Agent, the DIP Lenders, and the DIP Agent shall be and shall indefinitely remain Released
Parties under the terms of the Plan."  Disclosure Statement at 59.  These limitations on the power of the Disinterested
Director's ability to exclude certain parties from the Release remove any doubt that the "investigation" is a sham,
since the Disinterested Director may not remove such parties from the roster of Released Parties, even if the estates
hold valuable claims against them.  The hamstringing of the Disinterested Director, assisted by hopelessly conflicted
counsel who represented the party adverse to the Debtors in the VBC Sale Transaction, make clear that the Committee
is the only disinterested party who can conduct an unbiased and complete investigation of the estates' claims and
highlight how the expedited investigation timeline and lack of disclosures about the investigation are prejudicial to
the estates and creditors.

27.     The VBC Sale Transaction is particularly troublesome and requires substantially more disclosure.  Pursuant to the Plan, the assets the Debtors acquired from Steward in May 2022 in the VBC Sale Transaction will now be reunited with the related assets that had been retained by Steward.  Significantly, Debtors' counsel, Sidley, which represented **Steward** in the May 2020 VBC Sale Transaction with the Debtors, is now investigating whether to reverse its own previous transaction or whether any actionable claims arise from it in favor of the estates.  It is important to note that Sidley has no conflicts counsel in these cases; Sidley serves as the sole attorneys representing both the Debtors and the Independent Director in connection with any investigations.  Therefore, it appears Sidley is essentially investigating its current client (the Debtors), its former client (Steward), and itself.[11]

28.     Furthermore, as discussed in the *Declaration of Paul Rundell in Support of First Day Motions* [Docket No. 15] (the "Rundell Declaration"), additional cross-relationships exist between Sidley and its current client (the Debtors) and former client (Steward).  The Debtors acknowledge the relationship between the Debtors and Steward quickly became problematic, yet Mr. de la Torre retained his position on both the Debtors' and Steward's boards (until his resignation in October 2024), notwithstanding his significant personal gain from the VBC Sale Transaction.[12]

29.     Under section 1103(c)(2), the Committee is charged with investigating "the acts, conduct, assets, liabilities and financial condition of the debtor … and any other matter relevant to the case or the formulation of  a plan."  Here, the Debtors are racing to seek approval of the Plan and Disclosure Statement on an unnecessarily expedited basis with no oversight from the

---

[11] Presumably, Sidley will be disclosing these conflicts in its employment application but to date that application has not been filed.
[12] *See* Rundell Declaration at pp. 11-12, 18 fn. 6, and 21-22.

Committee who is the **only** disinterested fiduciary in these Chapter 11 Cases. The Committee must be given sufficient time and resources to conduct an investigation into the matters that appear to be subject to the Releases.

30.  Also glaringly absent is any mention of the alleged consideration being provided to the estates by any Released Party. The Debtors generically state that the Releases are "given in exchange for the good and valuable consideration provided by the Released Parties that is important to the success of the Plan."[13] However, the exact nature or amount of the consideration being paid by any Released Party is never disclosed. The Debtors must disclose what, if any, consideration is being paid by **each** beneficiary of the Releases. Furthermore, given that all assets are being sold, it must be clearly articulated why the Releases are, as the Debtors claim, "important to the success of the Plan." No explanation is offered for the conclusion that the Releases are essential in this, a liquidating case.

31.  In short, the Disclosure Statement does not provide any, let alone adequate, information on what claims are being released, against whom, for how much and why. This disclosure is critical in these cases. Unlike some cases, here the Committee's concern about what causes of action are subject to the Releases is not merely hypothetical. As discussed in detail above, valuable potential causes of action and claims may exist against certain Released Parties relating to the various prepetition transactions which must be thoroughly and independently investigated.

32.  Under these circumstances, it is vital that the Disclosure Statement adequately set forth the basis for the Releases so creditors can make an informed decision whether or not to opt out of them. As one court put it: "[T]hird-party releases are not a merit badge that somebody gets

---

[13] Disclosure Statement, Art. XI.B at p. 61.

in return for making a positive contribution to a restructuring.  They are not a participation trophy, and they are not a gold star for doing a good job. Doing positive things in a restructuring case - even important positive things - is not enough." *In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. 717, 726-727 (Bankr. S.D.N.Y 2019).  The self-interested actions of the Released Parties in these Chapter 11 Cases, benefitting no one but themselves, cannot merit a release without some indication of the value of the claims being released and the consideration being paid.

33.     Also lacking from the Disclosure Statement is the factual support for the Debtors' request that the Releases be approved as part of a global settlement pursuant to Bankruptcy Rule 9019.  The Fifth Circuit requires consideration of the following factors in approving a settlement: (a) the probability of success in litigation; (b) the likely difficulties in collecting any judgment; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors with deference to their reasonable views; and (e) the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion.  *In re Age Refining, Inc.*, 801 F.3d 530, 540 (5th Cir. 2015); *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980).

34.     None of these factors are discussed in the Disclosure Statement; nor are any supporting facts provided.  Here, the causes of action being settled in exchange for the Releases are not even identified, let alone valued, and nothing is offered by way of factual discussion in the Disclosure Statement informs creditors of how the Debtors' so-called settlement can satisfy the above factors which are required before this Court can approve the Releases as a settlement under Bankruptcy Rule 9019. Mere recitation of the relevant standards for approval of Rule 9019 settlements, without more, does not accomplish anything in the way of relevant disclosure of the

operative facts. Conditional approval of the Disclosure Statement[14] should be denied unless and until this material information is included in the document so that creditors asked to vote on the Plan and grant or withhold third party releases will have adequate information to cast their ballot and determine, as applicable (see below) whether to opt in or opt out of the third-party releases.

## C. The Proposed Third-Party Releases are Not Consensual Because the "Opt-Out" Provision Does not Constitute Consent.

35.     The Debtors portray the proposed blanket third-party releases – by impaired creditors who do not expressly opt out – as consensual and thus permissible.  Unsecured creditors must expressly opt out of the releases regardless of whether they vote for or against the Plan or abstain from voting on the Plan.  The only other option is to file an objection to the Plan affirmatively objecting to the Releases.  This methodology is coercive and more importantly does not yield consent.

36.     Additionally, the opt-out language in the Ballots (as attached to the Solicitation Motion) is confusing and given the dearth of factual information in the Disclosure Statement supporting the Releases, arguably coercive.  The Ballots for Class 2 unsecured creditors provide that if a creditor opts out of the Releases, it will lose its status as a Released Party.  Nothing in the Disclosure Statement indicates exactly what benefits inure to unsecured creditors from the Releases (given there is essentially no Plan treatment for them) or how such creditors could ever benefit from being Released Parties under the Plan given that the Debtors do not identify any causes of action it has against any particular unsecured creditor.  The result is a confusing and

---

[14] Use of the combined disclosure statement/plan approval procedures of section 105(d)(2)(B)(vi) of the Bankruptcy Code does not abrogate the requirement that a disclosure statement contain adequate information.  "Section 105(d)(2) lets this Court 'mix and match' the opportunities and timing for a debtor, creditors, and parties-in-interest, to file plans and disclosure statements, and solicit acceptances of such plans. It is an omnibus provision with which the Court can customize Chapter 11 preconfirmation procedures, *as long as those procedures are not inconsistent with other provisions of the Code*. Thus, the Court is authorized to use Section 105(d)(2) options as long as they don't conflict with Sections 1121 and 1125." *In re Aspen Limousine Serv.*, 187 B.R. 989, 995 (Bankr. D. Col. 1995) (emphasis added).

punitive sounding opt out provision designed to prevent any unsecured creditor from making the election.

37.     In the context of this Plan, this structure effectuates a forced nonconsensual release. Once a creditor determines that it is not getting any recovery, why would such creditor read any further to learn that a universe of persons is being granted releases and that the creditor is required to take immediate action to prevent that from occurring?

38.     A number of circumstances and factors raise questions as to whether "opt out" releases are ever truly consensual.  While the Committee is aware that some courts have allowed consensual third party releases to be inferred from a failure to affirmatively opt out, the practice of conferring consent to plan provisions from unresponsive creditors has been the subject of criticism in some recent decisions.[15]  In refusing to confirm the terms of a plan containing so-called consensual third-party releases subject to a negative notice opt out process, the court in *Emerge Energy Services* dealt with the exact fact scenario that exists here – ***a requirement that creditors who are receiving no distribution affirmatively opt out of a release***.  The court discussed the issues in the context of basic contract principles, holding as follows:

> For the Court to infer consent from the nonresponsive creditors and equity holders, the Debtors must show under basic contract principles that the Court may construe silence as acceptance because (1) the creditors and equity holders accepted a benefit knowing that the Debtors, as offerors, expected compensation; (2) the Debtors gave the creditors and equity holders reason to understand that assent may be manifested by silence or inaction, and the creditors and equity holders remained silent and inactive intending to accept the offer; or (3) acceptance by the creditors and equity holders can be presumed due to previous dealings between the parties. The Debtors cannot do so. ***The Class 6 creditors and Class 9 equity holders are receiving no distribution under the Plan*** and no previous dealings between the parties are in evidence. Moreover, while the Debtors included on the ballot and Opt-Out Form notice to the recipients of the implications of a failure to opt-out, ***the Court cannot on the record before it find***

---

[15] *In re Emerge Energy Services LP.*, 2019 Bankr. LEXIS 3717 (Bankr. D. Del. December 5, 2019); *In re SunEdison, Inc.*, 576 B.R. 453, 458-61 (Bankr. S.D.N.Y. 2017*); see also In re Wash. Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011); *In re Zenith Electronics Corp.*, 241 B.R. 92, 111 (Bankr. D. Del 1999).

> *that the failure of a creditor or equity holder to return a ballot or Opt-Out Form*
> *manifested their intent to provide a release. Carelessness, inattentiveness, or*
> *mistake are three reasonable alternative explanations.*
>
> The Court must respectfully disagree with its colleagues who have held differently
> as it has concluded that a waiver cannot be discerned through a party's silence or
> inaction unless specific circumstances are present.  A party's receipt of a notice
> imposing an artificial opt-out requirement, the recipient's possible understanding
> of the meaning and ramifications of such notice, and the recipient's failure to opt-
> out simply do not qualify.

2019 Bankr. LEXIS 3717, at *53-55 (emphasis added).

39.     Post-*Purdue*,[16] the argument against opt-outs has gained more traction, including

in this District.  *See, In re Smallhold Inc.*, 2024 WL 4296938 (Bankr. D. Del. Sept. 25, 2024)

(refusing to enforce releases against creditor who did not vote on plan); *In re Tonawanda Coke*

*Corp.*, 662 B.R. 220, 222-23 (Bankr. W.D.N.Y. 2024) (applying state law. requiring affirmative

action to waive a right or release a claim); *In re Ebix*, Case No. 24-80004-SWE-11 (Bankr. N.D.

Tex. Aug. 2. 2024).[17]  While certain courts have continued to deem consent from inaction and

accept opt-out provisions, the Committee submits such cases are wrongly decided.

40.     The Releases here are coercive, not consensual, and should not be approved without

further explanation of their scope and necessity, and with the coercive elements and processes

removed.  Otherwise, unsecured creditors are effectively being forced to "consent" to Releases of

unknown claims in exchange for no consideration whatsoever.

### D.    <u>Miscellaneous Solicitation Procedures Objections</u>

41.     In addition to the foregoing, the Committee respectfully submits that miscellaneous

provisions in the Solicitation Procedures require modification to avoid disenfranchising creditors

entitled to vote on the Plan.

---

[16] *Harrington v. Purdue Pharma L.P.,* 2024 U.S. LEXIS 2848 (June 27, 2024)

[17] A lengthy discussion of this argument and applicable case law is set forth in the *Objection of the U.S. Trustee to the Debtors' Disclosure Statement* [Docket No. 173].  The Committee adopts and supports the argument of the U.S. Trustee.

42.     The Debtors seek no responsibility to investigate undeliverable notices, ballots and
other components of the Solicitation Package.  In the Solicitation Motion, the Debtors state at page
11 that they seek the waiver of any obligation for the Debtors or the Notice and Solicitation Agent
to conduct any additional research for updated addresses based on undeliverable solicitation
materials (including undeliverable Ballots), and for purposes of serving the Solicitation Packages,
the Debtors are authorized to rely on the address information for Voting and Non-Voting Classes
as compiled, updated, and maintained by the Notice and Solicitation Agent as of the Voting Record
Date."  The Solicitation Procedures Order should provide that the Debtors shall make a reasonable
effort to locate or ascertain the correct mailing address for Claimants from information generally
available to the public and from such party's own records, but shall not be liable to such Claimant
for having not found a correct mailing address."  Further, the provision on page 6 of the proposed
order stating that "[a]ny obligation for the Debtors or the Notice and Solicitation Agent to conduct
any additional research for updated addresses based on undeliverable Solicitation Packages
(including undeliverable Ballots, Notice of Non-Voting Status Packages, and Combined Notices)
is waived" should be stricken.

43.     The Motion at page 12 states that "[f]ollowing the Solicitation Commencement
Date but after the Voting Record Date, the Notice and Solicitation Agent will send, to any Holders
of Claims in the Voting Classes who submitted a Proof of Claim after the Voting Record
Date, Solicitation Packages as updated by the Debtors and their Advisors from time to time to
reflect any changes to material facts (such updated Solicitation Packages, the "Supplemental
Solicitation Packages")."  However, in a mark-up of the proposed solicitation procedures provided
by the Debtors to Committee Counsel, this provision has been deleted.  The Debtors should remain

obligated to provide updated Solicitation Packages that reflect changed material facts and the Committee should get prior notice of any such changes.

44.     Similarly, the Debtors reserve the right to make what they deem to be non-substantive changes to a variety of documents sent to creditors, *i.e.*, the "Disclosure Statement, the Plan, the Solicitation Packages, the Combined Notice, the Patient Combined Notice, the Publication Notice, the Release Opt-Outs, the Ballots and any related documents without further order of the Court … before distribution."  The Debtors should provide at least two business days' prior written notice of all revisions to any of these numerous documents such that, if the Committee believes that the proposed changes are, instead, substantive and subject to objection, the Committee has an opportunity to bring such revisions to the Court's attention.

45.     Because the Plan does not contemplate substantive consolidation, the Class 3 Ballots should require or have listed the applicable Debtor obligor, instead of just referencing claims against the Debtors broadly.

## **CONCLUSION**

46.     The Court should deny approval of the Disclosure Statement, or in the alternative, require the Debtors to file a substantially amended Disclosure Statement that contains adequate information before solicitation may commence.  Further, the Court should require modification of the Ballots to provide for opt-in, not opt-out, third party releasees.  Finally, the solicitation procedures are deficient as set forth herein and should be addressed to avoid disenfranchising creditors entitled to vote on the Plan.

*[remainder of page intentionally left blank]*

Dated: December 15, 2024          Respectfully submitted,

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/  Michael D. Warner*
Michael D. Warner, Esq. (TX Bar No. 00792304)
Benjamin L. Wallen, Esq. (TX Bar No. 24102623)
700 Louisiana Street, Suite 4500
Houston, TX 77002
Telephone:  (713) 691-9385
Facsimile: (713) 691-9407
Email:  mwarner@pszjlaw.com
         bwallen@pszjlaw.com

 - and -

Bradford J. Sandler, Esq. (admitted *pro hac vice*)
Robert J. Feinstein, Esq. (admitted *pro hac vice* )
780 Third Avenue, 34th Floor
New York, NY 10017
Telephone: (212) 561-7700
Facsimile:  (212) 561-7777
Email: bsandler@pszjlaw.com
         rfeinstein@pszjlaw.com

-and-

Andrew H. Sherman, Esq. (*pro hac vice* forthcoming)
Boris I. Mankovetskiy, Esq. (*pro hac vice* forthcoming)
**SILLS CUMMIS & GROSS P.C.**
The Legal Center
One Riverfront Plaza
Newark, NJ 07102
Telephone: (973) 643-7000
Facsimile: (973) 643-6500
Email: asherman@sillscummis.com
         bmankovetskiy@sillscummis.com

*Proposed Counsel to the*
*Official Committee of Unsecured Creditors*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 15th day of December, 2024, a true and correct copy of the above Emergency Motion has been served on all parties that are registered to receive electronic transmission through this Court's CM/ECF filing system in these cases.

*/s/ Michael D. Warner*

Michael D. Warner
